UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO.: 7:20-CR-00167-M-3

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORDAN DUNCAN | MOTION TO DISMISS COUNT FIVE <br> ON THE GROUNDS OF DOUBLE <br> JEOPARDY |

Defendant Jordan Duncan, through undersigned counsel, moves this Honorable Court for an order for dismissal of Count Five of the Third Superseding Indictment on the grounds of Double Jeopardy and multiplicity, pursuant to the Fifth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3)(B)(ii).

**INTRODUCTION**

Jordan Duncan is not charged with any substantive offense in this case. Instead, he is charged with two conspiracy counts: Count One, conspiring to commit offenses under 18 U.S.C. § 922(a)(1)(A), and Count Five, conspiring to damage and attempt to damage property of an energy facility of the United States. *See* [D.E. 149].

The investigation which led to the arrest and charging of Mr. Duncan began in April of 2020, when the Naval Criminal Investigative Service (NCIS) became aware of a source reporting that alleged Liam Collins (a codefendant) was professing an ability to provide un-serialized weapons and silencers. What followed was an investigation into an alleged group that Collins was a part of (the group), spanning search warrants, electronic and physical surveillance, controlled purchases, financial

reviews of bank records, and interviews with sources and suspects. The FBI joined in the investigation.

The NCIS had previously become aware of Liam Collins after a Newsweek article labelled him as a member of a Neo-Nazi online forum named Iron March. The NCIS carried out a controlled purchase of a firearm and suppressor from Collins, and traced the money through financial review to one Paul Kryscuk (a further codefendant). Kryscuk was discovered to be purchasing parts to convert into illegal silencers. The FBI and NCIS discovered that Kryscuk manufactured the firearms, and in their controlled sales, sold them through Collins. At this point in the investigation, there was still no record nor implication on Mr. Duncan.

During the investigation, NCIS identified multiple purchases of firearms and silencers from Kryscuk, who was living at the time in Boise, Idaho. NCIS obtained a search warrant on some of the packages Kryscuk sent, under an alias of Shaun Corcoran, to North Carolina. These packages were found to contain the firearms and suppressors described above. As a result of these shipments, the FBI and NCIS came to the conclusion that Collins and Kryscuk caused the transport of a firearm into North Carolina. Collins had described himself as an integral part of the group to NCIS' source. Again, at this point in the investigation, there was still no record no implication on Mr. Duncan.

Kryscuk was active on the Iron March forum, having posted a manifesto-style post in March of 2017, which detailed racist and anti-Semitic ideals. Liam Collins was also described as very active on Iron March, and interacted and coordinated with Kryscuk on that forum. Mr. Duncan never posted to, or had any interaction with, Iron March. In fact, there was no evidence that he even knew Collins while the posts were being made to Iron March.

Where Mr. Duncan became a target of the investigation was when a package was shipped by a Shaun Corcoran to an address that appeared to be the same as Mr. Duncan's younger brother. This

package was never opened or examined by NCIS or the postal inspector. The FBI also saw Venmo online payment transactions between Mr. Duncan and Kryscuck    Mr. Duncan had previously served in the United States Marine Corps, stationed at Camp Lejeune.    Collins had also been stationed at Camp Lejeune, with some crossover to Mr. Duncan's times there.    Mr. Duncan had moved to Texas, and subsequently to Idaho.    He was surveilled in firearms training exercises with the group, and there were electronic records of him being in conversations and group chats with other members of the group.    The conversations Mr. Duncan had with members of the group were general in nature, talking about hypothetical and ideological times in the future when "an army would rise up."    They were not plans for immediate danger, but rather statements about thing that could happen at some unknown point in the future. Many of the conversations and ideas exchanged would be considered racist, hateful, and deplorable by the vast majority of society. But they fall under the umbrella of protected speech and symbolic conduct protected by the First Amendment.

Kryscuk, a mentally unstable person, was found to have photographs of various power stations in Idaho, as well as a list of intersections which contained power grid equipment in Idaho.    Mr. Duncan had no such photographs or lists.

The group's ideals were alleged to be fascist, Neo-Nazi views, including allegedly wanting to establish a white ethnostate, overthrow the Government, attract more people to their cause, install other members of the cause into office and high office, and create general chaos.    The basis of all of these allegations is speech.    It stems from conversations between the group members.    Some of the group members, including Mr. Duncan, moved to Idaho where he got a job at a defense contractor, and in their free time would do workouts and do firearm training exercises. But the vast basis of the allegations against Mr. Duncan, specifically the conspiracy charges, are rooted in speech and conversation.    Often in tasteless or inflammatory comments and statements, grounded in views that

would appall a large proportion of society.    But speech, nonetheless.

Mr. Duncan is not treated by anyone – whether the codefendants or the Government – as being a ringleader of the group.    Instead, he was a man who found people who wanted to share and debate ideologies and engage in the exchange of ideas and ideals, and carry out training drills and exercises, as he is protected in doing under the First and Second Amendments to the United States Constitution. Often, the alleged "planning" conduct of the conspiracies took the form of memes or subjectively-hyperbolic or darkly humorous images, followed by throw-away comments or jokes.    Otherwise, it took the form of owning or possessing firearms or other military-style gear, as he is protected in doing under the Second Amendment to the United States Constitution.

Mr. Duncan is not charged with the transport of firearms.    He is not charged with the transport of suppressors. He is not charged with delivering any weapon in interstate commerce.    He was not involved in any conversation about the shipping of firearms to North Carolina.    He was not involved in the manufacture of any weapon.    Instead, he is charged with two counts of conspiracy, based on conversations he had with other members of the group, and possession of various firearms and similar items.    The investigation was targeted at Collins and Kryscuk, and Mr. Duncan was implicated by association.

## LEGAL STANDARD

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const amend. V. Where a case involves more than one count of conspiracy, "the Double Jeopardy Clause prohibits dividing one overarching conspiracy into two separate counts." *United States v. Jones*, 858 F.3d 221, 225 (4th Cir. 2017). Rule 12(b) of the Federal Rules of Criminal Procedure requires any

motion on the basis of a defect in the indictment including charging the same offense in more than one count (multiplicity) be made at the pretrial motions stage.

In order to assess whether the two conspiracies are separate, the "totality of the circumstances" test is applied. *See U.S. v. Ragins*, 840 F.2d 1184, 1188 (4th Cir. 1988). This test is made up of five factors:

1) The time periods in which the alleged activities of the conspiracy occurred;

2) The places where the alleged activities occurred;

3) The persons acting as co-conspirators;

4) The overt acts or any other descriptions of the offenses charged which indicate the nature and scope of the activities to be prosecuted; and

5) The substantive statutory offenses charged in the indictments.

*United States v. MacDougall*, 790 F.2d 1135, 1144 (4th Cir. 1986).

The defendant bears "[t]he initial burden of raising and pleading the double jeopardy claim." *Ragins*, 840 F.2d at 1191. The defendant must point to "substantial overlaps in the two charged conspiracies" to meet this burden. *See United States v. McHan*, 966 F.2d 134, 138 (4th Cir. 1992). Once a non-frivolous argument has been demonstrated, the burden then shifts to the government to prove that there are two separate criminal agreements. *Jones*, 858 F.3d at 225 (citing *Ragins*, 840 F.2d).

## **ARGUMENT**

In this case, the Third Superseding Indictment (the Indictment) alleges two separate counts of conspiracy: Count One and Count Five. If it is the government's position that these two alleged conspiracies are entirely separate, and relate to different overall schemes, then they should be severed due to the prejudice caused by joining them. *See Defendant's Motion for Relief from*

*Prejudicial Joinder*. If, however, the government's position is that these two counts relate to different parts of the same overarching conspiracy, then they should be dismissed on the grounds that they violate Mr. Duncan's Fifth Amendment rights.

Using the five-factor "totality of the circumstances" test in *MacDougall*, it is plain that both alleged conspiracies arise out of the same set of facts, and that allowing Mr. Duncan to be charged for both would expose him to double jeopardy.

## A. Time periods

Both counts allege a conspiracy starting date of in or about June 2019, continuing to "the present". As such, both counts clearly encompass the same timeframes, and relate to the same period.

## B. Places

Both counts reference alleged conspiracies which were to take place in Boise, Idaho, and which were formed in the Eastern District of North Carolina. Paragraph 24(e) of Count One alleges that one defendant mailed a pistol from Idaho to the Eastern District of North Carolina, and 24(f) alleges that Mr. Duncan was told by another defendant to "follow BLM Boise [Idaho]." Similarly, Paragraph 31(l) of Count Five alleges that a group of defendants "discussed their plans" while all defendants were known to be living in Idaho, Mr. Duncan having moved there from the Eastern District of North Carolina, and 31(m) details a list of power grids, again all within Idaho and surrounding states.

Further, both counts reallege and incorporate Paragraphs 1 through 20 (the Introduction). This introduction includes a number of places where each defendant resided, both before and during the alleged conspiracies. As both counts allege all 20 paragraphs identically, it is self-evident that the conspiracies relate to the same places.

### C. Persons acting as co-conspirators

Count One alleges a conspiracy formed by five individuals: COLLINS, KRYSCUK, HERMANSON, MAURINO, and Mr. Duncan. Count Five alleges a conspiracy formed by four of those five same individuals. As such, there is a 100% overlap between the alleged conspirators of each count, which is indicative of one overarching conspiracy. *See e.g., MacDougall*, 790 F.2d, at 1145 ("the issue is whether the evidence of overlapping personnel establishes a single conspiratorial scheme); *Cf. United States v. Lurz,* 666 F.2d 69 (4th Cir. 1981) (holding that conspiracies involving few overlapping characters are unlikely to be one overarching conspiracy).

### D. Overt Acts and other descriptions of the offenses charged and their scope

As stated above, Count One and Count Five share 20 identical paragraphs describing the relationships, locations, goals, and movements of the alleged co-conspirators. Count One alleges that the purpose of the conspiracy was to use firearms for criminal purposes, in furtherance of civil disorder, while Count Five alleges that the purpose of that conspiracy was "creating general chaos," amongst other purposes. These two purposes, civil disorder and general chaos, are of one tenor.

The Introduction describes the ideologies behind the alleged conspiracies, and the purchase and transfer of firearms related to Count One are realleged in Count Five at Paragraphs 11, 12, 17, 19 and 20.

The first overt act alleged in Count Five at Paragraph 31(a) relates to COLLINS entering the Marines and being stationed at Camp LeJeune, North Carolina. Count One also alleges, in the integrated Paragraph 2, that COLLINS "entered that Marines and was stationed at Camp LeJeune, NC."

In Count Five's Paragraph 31(e), KRYSCUK moving from New York to Boise, Idaho, is alleged as an overt act in furtherance of that conspiracy. In Count One's realleged Paragraph 3 KRYSCUK is alleged to have "lived in New York until early 2020, when he moved to Boise, Idaho."

In Count One's Paragraph 24(d), MAURINO is alleged to have offered to sell an "untraceable" Glock in May 2020, which in turn was alleged to be an overt act in the Count One conspiracy. Count Five's realleged Paragraph 18 describes MAURINO offering to "provide […] an untraceable Glock" in May 2020.

### E. Statutory offenses charged

The two counts charge the conspiracy under two statutes, 18 U.S.C. § 371, and 18 U.S.C. § 1366(a). The first is the general conspiracy statute, and the latter is a more specific statute aimed at those who conspire to target energy facilities and power stations. Although these two statutes are distinct, this is not indicative of two separate conspiracies. The government may not separate a "smaller piece from the larger conspiracy [that] would look dissimilar to the large piece" through "artful drafting." *United States v. Jones*, 858 F.3d 221, 226 (4th Cir. 2017). The Double Jeopardy Clause is not negated through "the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown v. Ohio*, 432 U.S. 161, 169 (1977).

Further, other courts have found that a § 1366(a) offense can be incorporated under a § 837 conspiracy charge, where the conspiracy includes destruction of an energy facility. *See, e.g., U.S. v. Sharp,* 927 F.2d 170 (4th Cir. 1991) (where defendants were charged under § 837 with one count of conspiracy, with the underlying offense included in that count being a § 1366 violation); *U.S. v. Thurston,* CR 06-60069-01-AA, *et al*. (D. Or. May 21, 2007) (all defendants pled guilty to a §

837 conspiracy to destroy an energy facility, two defendants also pled guilty to the substantive offense of actually destroying the facility under § 1366).

As such, though the conspiracy can be divided in segments between two statutes, that does not indicate the presence of two distinct conspiracies.

### **CONCLUSION**

By all five standards of the multi-factored "totality of the circumstances" test, the facts alleged in the indictment point to one overarching conspiracy. As such, one of the two counts must be dismissed so as not to violate Mr. Duncan's right under the Fifth Amendment to be protected from double jeopardy. Should the government contend two distinct conspiracies, then Mr. Duncan's Motion from Prejudicial Joinder should be granted. In either event, the government cannot maintain both positions.

Respectfully submitted, this, the 22nd day of August, 2023.

TARLTON LAW PLLC

/s/ Raymond C. Tarlton
Raymond C. Tarlton
Attorney for Defendant
N.C. State Bar # 38784
ray@tarltonfirm.com

P. O. Box 91624
Raleigh, NC 27675
919-390-1278 (TEL)
919-400-4200 (FAX)
*Designation: CJA Appointed*

/s/ Joshua D. Xerri
Joshua D. Xerri
Attorney for Defendant
N.C. State Bar # 60127
jd@tarltonfirm.com

P. O. Box 91624
Raleigh, NC 27675
919-390-1278 (TEL)
919-400-4200 (FAX)
*Designation: CJA Associate*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date shown below, he electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to Assistant United States Attorney Barbara Kocher.

This, the 22nd day of August, 2023.

/s/ Raymond C. Tarlton
Raymond C. Tarlton