UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

--------------------------------------------------------------
UNITED STATES OF AMERICA,

                    Plaintiff,

        -vs-                            Case No. 7:20-CR-167-M-3


JORDAN DUNCAN,

                    Defendant.
--------------------------------------------------------------

PUBLIC TRANSCRIPT OF SENTENCING HEARING
OCTOBER 28, 2024

**(Pursuant to Standing Order 22-SO-1, portions of all
guilty plea and sentencing transcripts are restricted.)**

THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
UNITED STATES DISTRICT JUDGE


**A P P E A R A N C E S**


On Behalf of the Government

**GABRIEL J. DIAZ
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601**


On Behalf of the Defendant

**RAYMOND C. TARLTON
Tarlton Law Firm
P.O. Box 91624
Raleigh, North Carolina 27656**


Risa Kramer, RMR, CRR
Official Court Reporter
United States District Court
Wilmington, North Carolina

TRANSCRIPT OF PROCEEDINGS

(Proceedings commenced at 10:46 a.m.)

THE COURT: All right. If the clerk would please call the case.

THE CLERK: United States of America versus Jordan Duncan.

THE COURT: Counsel, please state your appearance for the record.

MR. TARLTON: Good morning, Your Honor. Raymond Tarlton on behalf of Mr. Duncan.

MR. DIAZ: Good morning, Your Honor. Gabriel Diaz on behalf of the United States.

THE COURT: Good morning, Mr. Duncan. If you'd please stand so the clerk can administer the oath.

THE CLERK: Please place your left hand on the Bible, raise your right hand, and state your full name for the record.

THE DEFENDANT: Jordan Calhoun Duncan.

(The defendant was placed under oath.)

THE COURT: Mr. Duncan, have you taken any substance in the last 48 hours that would affect your ability to hear and understand these proceedings today?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you understand what's happening here today?

THE DEFENDANT:  I do.

THE COURT:  Mr. Tarlton, do you have any doubt about your client's competence to proceed today?

MR. TARLTON:  No doubt, Your Honor.

THE COURT:  Mr. Diaz, does the United States have any such doubt?

MR. DIAZ:  No, Your Honor.

THE COURT:  Based on this Court's questions and the defendant's and counsel's answers, this Court finds that the defendant is competent to be sentenced today.

Mr. Duncan, in light of some cases from the Supreme Court of the United States, including the Booker, Rita, Gall, Spears, and Nelson cases, the sentencing guidelines are no longer mandatory.  They are advisory.  Nevertheless, in accordance with those Supreme Court cases, as well as a number of decisions from the Fourth Circuit Court of Appeals that interpret those cases, this Court still must take into account the now-advisory guidelines.

The Court does this by initially ruling on any objections and making findings of fact.  Next, the Court will calculate an advisory guidelines range.  The Court then will consider any motion that might move that range either up or down.

Next, the Court will consider all arguments that your lawyer makes concerning your sentence both in court and in any motion or memorandum, any statement you would like to make concerning your sentence, and the arguments of the Assistant United States Attorney both in court and in any motion or memorandum. I'll then give your attorney an opportunity to respond.

Then finally, after my own discussion of the arguments presented and consideration of the sentencing factors, I'll announce your sentence in open court.

Now, this is an 11(c)(1)(C) plea to a stipulated sentence, so I'll -- we'll do the entire process because there are some things that appear to be significantly contested. But that's the process we follow.

Mr. Tarlton, did you receive a copy of the defendant's presentence report?

MR. TARLTON: We have, Your Honor. Yes.

THE COURT: Mr. Duncan, have you discussed your presentence report with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you have any objections to the report that were not raised by your attorney?

THE DEFENDANT: No, Your Honor.

THE COURT: Mr. Tarlton, does your client

object to the proposed conditions of supervised release as set forth in the presentence report? I believe there were a couple noted.

MR. TARLTON: There were a couple to the -- I think the Court -- I've heard the Court in another sentencing discuss the Court's approach to the warrantless search requirement. And I think that would be sufficient -- or we would agree with that.

There was another -- I think --

THE COURT: I think it was the financial conditions as being --

MR. TARLTON: That's right.

THE COURT: -- as being excessively intrusive in this case.

MR. TARLTON: That's right. There's no -- he'll pay the 100-dollar assessment, Your Honor.

THE COURT: Based on everything that I understand about the case, I believe it's correct to not impose those over objection.

MR. TARLTON: Thank you.

THE COURT: Mr. Diaz, does the United States have any objections?

MR. DIAZ: Your Honor, I'll note for the record that we had filed an objection to the PSR requesting that the enhancement under Note 4 of 3A1.4 be

illustrated in the PSR, like in Maurino's last week, and some of the other defendants.

I didn't realize until this morning that it never actually made it to the final PSR. I did advise Madam Probation Officer in court today that that was an issue.

THE COURT: Okay.

MR. DIAZ: But that was one of the two reasons in the plea agreement that we'd ask the Court to enhance anyway to get to the seven-year mark.

THE COURT: Right. I saw the dispute. We'll talk about that in a moment.

All right. Y'all may have a seat. The presentence report shall be placed in the record under seal.

In accordance with Rule 32 of the Federal Rules of Criminal Procedure, the Court accepts as accurate the presentence report except as to matters in dispute as set forth in the addendum. The Court notes the addendum contains no objections from the United States and six objections from the defendant.

Mr. Tarlton, what's your preference? This is 11(c)(1)(C), so none of them ultimately affect...

MR. TARLTON: They don't. And after we filed this, in the final PSR, I would note, starting at

paragraph 50 on page 20, the actual -- what probation has determined to be, in its view, the applicable guideline range of offense level 19, criminal history I, 30 to 37 months -- that's very close to our theory of the applicable guideline range. So we really don't need to press anything on that, Your Honor.

THE COURT: All right. Now, I want to be sure that I understand the state of the objection. We're 11(c)(1)(C). The parties negotiated that. That gives us an 84-month stipulated sentence. You're not asking to come out of that stipulation. You're just asking that the guidelines be reflective of your theory of the case.

MR. TARLTON: That's right. Reflective of our theory of the case. And I think we are in agreement with probation's calculation here. And so, ultimately, I believe that this Court can anchor the (c)(1)(C) sentence under the particular facts of this case, my client's history and characteristics, and the nature and circumstances of this case as to my client under 3553(a).

I don't think the Court is bound to ground the (c)(1)(C) sentence in a guideline-based specific departure. And so I just say that to actually contextualize everything we would say today, frankly,

Your Honor.

THE COURT: Okay. So we don't need to be heard, then, any further on the objections.

MR. TARLTON: No, Your Honor.

THE COURT: Okay. Given the 11(c)(1)(C) nature of the case, the Court's obligation to hear objections, which have no impact on the guidelines, does not apply -- or the Court is not obligated to hear objections that have no impact on the guidelines, ultimately, and to sentence the -- the defendant, through counsel, has accepted the provisions that were provided in the presentence report in its revised form. So the Court does not rule on each objection.

MR. TARLTON: Thank you.

THE COURT: Based on the record and governing law, the Court calculates the advisory guideline range applicable to the defendant's case as follows:

Total offense 19. Criminal history category I. The advisory guideline range is 30 to 37 months.

The parties have stipulated, pursuant to 11(c)(1)(C), to a sentence of seven years, or 84 months, with imposition of a period of supervised release.

No fine imposed, no restitution owed, and no other form of monetary punishment or obligation imposed

except for the mandatory special assessment of $100 as to each offense of conviction.

Mr. Tarlton, do you have any objections to the offense level, criminal history category, or advisory guideline range as stated by the Court?

MR. TARLTON:  No, Your Honor.

THE COURT:  Mr. Diaz?

MR. DIAZ:  No, Your Honor.

THE COURT:  Guideline computation was arrived at as follows:

Base offense level in this matter is 18. There's a four-level enhancement for using or possessing the firearm in connection with another felony offense.

No victim-related adjustment, no adjustment for role in the offense, no adjustment for obstruction of justice.

The adjusted offense level subtotal is 22. There's no Chapter 4 enhancement.  The defendant's received three points of credit for timely acceptance of responsibility, which leads to the total offense level of 19 in this matter.

The sentencing options available to this Court are as follows:

The statute provides for zero to ten years. The guidelines recommend 30 to 37 months.  This is an

11(c)(1)(C) plea where the United States has made concessions as to charging, and the Court recognizes those concessions and the joint recommendation of the parties.

Statute provides for zero to three years in custody. The guidelines recommend one to three years. Statute provides for one to five years on probation. The guidelines render this defendant ineligible for probation.

Statutory maximum fine is $250,000. The guidelines recommend a fine range of 10,000 to $100,000. Restitution is not applicable. And there is a mandatory special assessment of $100.

Mr. Tarlton, I'll hear from you now for remarks on behalf of your client concerning the 3553 factors.

MR. TARLTON: Thank you, Your Honor.

And I would just note that his parents, Frank and Julia, have come into the courtroom. They were here earlier, somehow went to another courthouse, but they're here in support -- he has strong family support, and that's a part of 3553(a).

He's 29 years old, a former Marine, Your Honor. Back at the offense of conviction, in June of 2019, he was 24 years old. And that's what's put him

before the Court today for sentencing.

Before this offense, his only brush with the law was a speeding infraction, I think, in 2018 and then another traffic infraction that was dismissed in 2013.

His father's a pastor. His mother does not work outside of the home. Jordan is the oldest of four children. He has three younger siblings. Ben is in the Air Force, and then Jared and Madeline live with the parents.

He was raised in Bailey, North Carolina, in eastern North Carolina. He played tennis in high school down there, and afterwards, he enlisted in the Marines. He served in the intelligence unit, worked his way up to E4, or corporal. He had a combat deployment to Syria and humanitarian deployment to Haiti. He was honorably discharged. In the Marines, he developed many skills, including in Russian linguistics. He worked good jobs in information technology after the Marine Corps and up until his arrest in this case.

Your Honor, obviously, you know, he's pled guilty to a federal firearms offense, and the Court's extremely familiar now with the broader context and backgrounds. And indisputably, he was involved in a militia, and him and other folks embraced really deplorable, hateful, and racist ideology. And we know

that the government has arguments in line with a theory of, essentially, domestic terrorism. We dispute that his role, level, and true intent evolved to that point.

He does want the Court to know that probably the worst messages and statements attributed to him by the government that is in the indictment -- Court may be familiar with it. It's also in the PSR -- where the government characterizes he's discussing shooting protesters in Boise. Talks about going to Chipotle after hitting legs, and ultimately culminates in these statements about the end of democracy.

In the indictment, it's attributed as a series of seven statements on October 1st of 2020. What we want the Court to know is if you pull the actual Instagram business records -- and if the Court wanted to, we could put them on the screen for the Court. But it's actually a conversation between him and Paul Kryscuk on Instagram direct messenger that takes place over about 27 hours under UTC Time, but that's seven hours ahead of Mountain Time. There's many, many messages and sharing of posts in between those -- those statements attributed to him. So our point is what was in the PSR on that and what's in the indictment, as to his message, is really out of context, and that his ultimate statement about the end of democracy is in

direct quotations coming from what we believe is a CNN article in relation to the election in 2020.

And the "hitting legs" statements -- when you do a controlled search on his Instagram business records, he's constantly talking about working out, workouts with these guys and going to the --

THE COURT: I'm familiar with "hitting legs" being...

MR. TARLTON: Right. A gym.

THE COURT: Slang for "We just left the gym, and it was leg day, not arm day."

MR. TARLTON: That's -- and again, we're not walking away from the bad facts and ideology and stuff that was going on here. There was a lot of young male bravado going on with this group, and -- leave it at that point.

He has plans for the future. He wants to -- he's a very intelligent man. I've represented him now for, I guess, nearly four years. He actually gets along in the jail with everybody: all races, ethnicities, religions. He's been in the general population at the various jails here over the last number of years while I've been dealing with this case.

And his plan is to finish college -- or do college correspondence while he's in the BOP to try to

work his way towards a bachelor's degree, and then when he gets out, finish college under the G.I. Bill.

He's also got a strong interest in personal fitness, personal training, and so he wants to develop skills for that as a possible career path for him.

His parents now live in Greencastle, Pennsylvania, which is sort of near the mountains, especially mountains of Maryland, and there's -- we would ask for judicial recommendation to FCI Cumberland, which is within an hour of his parents.

Thank you.

THE COURT: Thank you, counsel.

Mr. Duncan, this is your opportunity to tell me anything you want me to know as I consider your sentence.

THE DEFENDANT: I have nothing to add, Your Honor.

THE COURT: All right. Thank you, sir.

Mr. Diaz.

MR. DIAZ: Thank you, Your Honor.

The idea that this defendant was just part of a militia group just doesn't track with all of the evidence in this case and what some of the codefendants and other co-conspirators have told the government and the Court.

Let's start with paragraph 17, Your Honor. The whole purpose of this group was to create a white ethno-state. That was it. He was recruited -- also paragraph 17 -- because of his distinct skills in the Marine Corps: signals intelligence.

Paragraph 19, Your Honor. The defendant "obtained a massive library on explosives and other mass casualty methods," which included SIGINT training information; "for official use only" marked items.

What's interesting here is about true combat action reports, maps of various military installations, a record of radio frequencies used by various agencies and law enforcement, and instructions on how to disable such communications. Something that you would do if you wanted to take out a power station.

He was part of the training and preparation that this group took on. At paragraph 21, he was in Long Island, New York, with Kryscuk and Maurino, where they were firing short-barrel rifles at that range. To mask what they were doing and their identities, Kryscuk switched license plates out from the vehicle as they went into that range.

Paragraph 23, Your Honor -- yeah, paragraph 23. I believe it's page 13. "Zacharek advised that the group began forming more concrete plans with training

ops and ideas of going operational" subsequent to this defendant joining the group.

And page 15, paragraph 23, which is what really came to a head and why we believe we were able to stop this from occurring, was a conversation that was heard by the wife of Kryscuk where Kryscuk, Duncan, and Collins were talking about shutting down the power grid, which is why she felt compelled to call the FBI.

So, Your Honor, this defendant was purely -- was actually involved in this group. The purpose of this group was a white ethno-state. One of the many ways that accelerationists want to do that is by taking out the power grid to start mass chaos. And so we believe the defendant had the tools, the training, and the ideology to do all this.

Your Honor, these are all the reasons we believe the defendant should be sentenced to a seven-year sentence. Thank you.

THE COURT: Thank you, counsel.

Mr. Tarlton, I'll give you the opportunity to respond, if you wish.

MR. TARLTON: We don't need to be heard further, Your Honor.

THE COURT: All right.

Here's what happens next. In keeping with

Fourth Circuit precedent, I'll discuss the arguments that I've heard. I'll discuss my own application of the 3553 factors. And then, Mr. Duncan, at the appropriate time, I'll tell you to stand -- you can sit for a moment. I'm gonna have to talk a little bit. I'll tell you to stand when I'm ready to pronounce your sentence.

The Court has been through many proceedings in this case now, and the different groups -- there are different sort of overlapping groups within, ultimately, this organization; different groups of people who were situated slightly differently.

The core of this case, and the one to which the defendant has pled guilty, is an illegal firearms distribution case. This is a case where individuals were making unserialized firearms, distributing them amongst the members of the group. Some of those firearms had illegal receivers; some of them had illegal suppressors. Some of them were short-barrelled. And there were a group of young men who collected these things, went on live fire exercises with these illegal firearms, engaged in some very difficult speech surrounding why they might need these and who might ultimately become the targets of these firearms.

And then there was a more targeted discussion of attacks on specific power stations that

were identified that led to the most significant charges in this case.

This defendant did not plead guilty to a domestic terrorism charge. He pled guilty to a firearms charge.

Some of the speech, while disturbing -- has been characterized by others as "reprehensible" -- is speech. You can say terrible things. This is the United States of America. You don't have to like anybody you don't like, and you can say terrible things.

What you cannot do is actively begin to plan to harm people or to destroy the infrastructure of the country in ways that are concrete, particularized, and have advanced beyond bloviating on the Internet to actually doing something.

Now, this is an 11(c)(1)(C) plea. There's an agreed sentence between the parties. This case did not go to trial. Some of these -- some of the witnesses would have had some credibility problems. There was a very extensive exposure for this defendant had he gone to trial. So the Court finds that it is a reasonable sentence, under all of the facts and circumstances known to the Court, for the parties to have negotiated and agreed upon the 11(c)(1)(C) sentence in this case. It constitutes careful lawyering. Mr. Tarlton has been a

zealous advocate for his client the entirety of this case. This Court has sat through multiple hearings where Mr. Tarlton has represented Mr. Duncan zealously. The United States has maintained its positions throughout and maintained that it was ready to go forward with the witnesses that it had.

Ultimately, this was the negotiated plea to the firearms charges, and it has been disputed the entirety of the time -- the extent of this defendant's intent to engage in the particular acts of domestic terrorism. He has not admitted to that. The United States has remained committed to all of the intelligence information, wiretap information, signals information that it has gathered that it has stated that it believes it can prove it.

Ultimately, such a fact-finding is not necessary by this Court. This is a stipulated plea agreement to a stipulated sentence.

The central witnesses as to this defendant's participation in the acts of domestic terrorism as opposed to just wanting a separatist movement that had some desire to be prepared in the event that everything went dark has been in dispute from the beginning.

Those have been the arguments that are principally before the Court. And as I said, I

understand -- I understand how we -- how we landed here, and I accept the 11(c)(1)(C) position.

Mr. Tarlton, are there any arguments you wish me to directly address on behalf of your client you believe I have not?

MR. TARLTON:  No.  I think the Court has done a great job summarizing our position.  Thank you.

THE COURT:  Mr. Diaz?

MR. DIAZ:  No, Your Honor.  Thank you.

THE COURT:  This Court recognizes its obligation under section 3553(a) to impose a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in section 3553(a). I've considered all the arguments defense counsel has made, the defendant's positions in his various filings, and the arguments of the Assistant United States Attorney.

I recognize that the sentencing guidelines are advisory; they are not mandatory.  The Court finds that there is sufficient basis, based on the prior sentencings in which it has engaged, to find that the upward variance from the guidelines sentence in this case to the stipulated 84-month sentence is warranted under all the facts and circumstances known to the Court, as presented both in this plea agreement, as

presented at the various hearings that this Court has presided over, and at the various sentencings in this case.

I recognize that those guidelines are advisory, they are not mandatory, and that 3553(a) permits the upward variance that is agreed upon.

I've considered the relevant factors under Title 18, United States Code, Section 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant. The defendant's proposed basis for upward variance that was presented in the stipulated plea agreement and before this Court has been the concerns about access to classified materials and the fact that those classified materials ultimately ended up in the hands of people who didn't need access to them.

MR. TARLTON: And I think it was -- the sensitive "for your eyes only" is the actual stuff that we were...

THE COURT: Right --

MR. TARLTON: Discussing -- right.

THE COURT: I think there are various materials at various levels of classification.

MR. TARLTON: Right.

THE COURT: And the ones that have been

stipulated to -- there are others that were at a higher level of sensitivity that have been objected to by the defense as available elsewhere on the Internet; that it can't be proven that they are directly traceable to this defendant. I understand the argument.

MR. TARLTON: Yes. Thank you.

THE COURT: Wherever they might have been available, they ultimately were available to this defendant, and they wound up in the hands of the people with whom he is friends. And from everything the United States has on the devices that it has searched, it has certainly been in this defendant's hands and ultimately ended up in the hands of his co-participants.

I understand -- I understand the arguments that would have been presented to a jury. But there was a breach of trust there as to these materials are being provided to you because of a very sensitive position, and that breach of trust has resulted in at least some of the materials that were available to the defendant and cannot be shown to be otherwise available ending up in the hands of his codefendants.

So I've considered the nature and circumstances of the offense, the history and characteristics of the defendant. I've actually tried very hard to draw appropriate inferences in favor of the

defendant and then ultimately decide are we at a fair place. And I find that we are. Drawing every inference in his favor, there is still a sufficient basis for the plea that has been entered.

I recognize the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The stipulated sentence will do that.

I recognize the need to afford adequate deterrence to criminal conduct and to protect the public from further crime of the defendant.

Mr. Duncan, I'm sad because much of what I've heard about you suggests that the person who was writing all that stuff is not the person who's sitting in front of me here today, and that you're better with real human beings than you are in that sort of dark, angry place with a lot of other very angry, young men. And I suspect the person sitting here today, on reflection, isn't that person that is captured in that very dark place. Those were some dark forums. It was a strange time in America. People were setting buildings on fire. And I understand where overreaction and concern could lead to harsh thoughts. What we don't get to do is have all the illegal guns and move the materials around.

So I'm sad for you. The things Mr. Tarlton has described about you and how you get along with everybody once you meet them, and they are people and not images out in the distance -- I see your family behind you supporting you here. So my hope is that you serve your sentence, you do good time, and that you're -- the person who served his country admirably gets back to a place that is safe and comfortable and happy for you.

I recognize the need to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. And I recognize the need to avoid unwarranted sentence disparities amongst defendants with similar records who have been found guilty of similar conduct. This sentence is in line with the other sentences handed out by the Court for the reasons stated.

The other thing I am concerned about -- and I want to be sure I state it for the record -- is angry people talk themselves into stupid things. And the United States was correct to make sure that the ultimate dangers didn't transpire because people had talked themself up and up and up and into real violence. It is always one's hope that when faced with the violent

moment, people have time to walk away.  And that is why we are concerned with inchoate offenses; that when people who've talked themselves into a high dudgeon ultimately are faced with the moment of hurting another person, they realize it and stop.

Now, shooting up a power station doesn't have a person in front of you, so it's more likely to happen, even from -- people who might pause at hurting a person can talk themselves into blowing up a power substation and not quite see it the same way.  So the United States raised real concerns.  The Court recognizes they're acting on real concerns and that they operated their investigation in good faith.

You may stand.  I'm going to formally pronounce your sentence.

Except as heretofore stated, the Court finds the bases for the findings contained in the presentence report credible and reliable, and therefore the Court adopts those findings.  Based on those findings, the Court has calculated the imprisonment range prescribed by the advisory sentencing guidelines.  The Court has considered that range, as well as other relevant factors set forth in the advisory sentencing guidelines, and those set forth in Title 18, United States Code, Section 3553(a).  Further, the Court adopts and imposes the

applicable special conditions of supervision referenced in the presentence report.

Pursuant to the Sentencing Reform Act of 1984, and in accordance with the Supreme Court's decision in United States versus Booker, it is the judgment of this Court that the defendant, Jordan Duncan, is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 84 months.

The Court has determined that a sentence above the advisory guideline range is warranted in this case based on the stipulated conduct before it, and that this is sufficient but not greater than necessary to achieve the intended goals of sentencing.

Pursuant to the plea agreement, the third superseding indictment is dismissed.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.

Further, after careful consideration of the provisions of Title 18, United States Code, Section 3583(d), the sentencing factors outlined in Title 18, United States Code, Section 3553(a), and the conditions now imposed, the Court orders that the defendant shall comply with the mandatory and standard conditions of supervision adopted in the Eastern District of North

Carolina as referenced in the standing order.

The defendant shall also comply with the following special conditions which are imposed based on the statutory requirements, the nature of the instant offense, the defendant's use of a cellular telephone and computer device to facilitate this offense, his history of alcohol abuse, the defendant's need for vocational skills, and to adequately supervise the defendant based on the aforementioned issues.

The defendant shall abstain from the excessive use of any alcoholic beverages, shall not associate with individuals consuming alcoholic beverages to excess, shall not frequent business establishments whose primary product to the computer [sic] is alcoholic beverages, and shall not use any medication containing alcohol without the permission of the probation officer or a prescription from a licensed physician.

I have modified that condition from "any use" to "use in excess." That's a judgment call. Please use good judgment.

THE DEFENDANT: Yes, Your Honor.

THE COURT: The defendant shall submit to a search at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence,

vehicle, papers, computer, other electronic communication or data storage devices or media and effects, upon reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, or to a search by any probation officer in the lawful discharge of the officer's supervision functions.

The Court notes that Fourth Circuit precedent may require a probation officer to have some particularized suspicion to render certain searches lawful. The Court imposes lawful searches.

The Court finds this search condition reasonably related to the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to protect the public from future crimes of the defendant.

The Court particularly notes the defendant possessed firearms and used electronic devices to coordinate the possession and sale and distribution of illegal firearms in consultation with the other co-participants in this scheme, and also that he disseminated sensitive materials via electronic means as well, had access to those.

The defendant shall participate in a vocational training program as may be directed by the

probation office. This is based on the defendant's desire to participate in education and vocational service programs that will assist him in developing or enhancing the skills needed to obtain and maintain gainful employment.

It's further ordered the defendant shall cooperate in the collection of DNA as directed by the probation officer.

It's further ordered the defendant shall pay the United States a special assessment of $100, which shall be due immediately.

The Court finds that although provisions of the Victim and Witness Protection Act are applicable, as there was no identifiable loss associated with this offense, restitution is waived.

The Court finds that the defendant does not have the ability to pay a fine. Therefore, no fine is being imposed.

Jordan Duncan, you can appeal your conviction if you believe your guilty plea was somehow unlawful or involuntary, or if there is some other fundamental defect in the proceedings that was not waived by your guilty plea. You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think the sentence is

contrary to law.

However, a defendant may waive those rights as part of a plea agreement, and you have entered into a plea agreement which waives some or all of your rights to appeal the sentence itself. Such waivers are generally enforceable, but if you believe the waiver is unenforceable, you can present that theory to the appellate court.

With few exceptions, any notice of appeal must be filed within 14 days of judgment being entered on the docket in your case. If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis. If you so request, the Clerk of the Court will prepare and file a notice of appeal on your behalf.

And it was FCI Cumberland? Is that correct?

MR. TARLTON: Yes, Your Honor. That's right.

THE COURT: All right. The Court recommends that -- as consistent with BOP regulations, that the defendant be placed at FCI Cumberland as the facility closest to his family to facilitate their continued support.

MR. TARLTON: Thank you, Your Honor.

THE COURT: The Court further recommends

that he have access to any and all education and vocational program for which he is eligible and in which he is interested. The Court particularly notes the defendant's interest in completing a college degree, and the Court orders that he have any appropriate access to such training.

The Court also recommends that he have a full mental and physical health evaluation and any appropriate treatment and that he have access to the most intensive substance abuse training program available at the facility to which he is assigned, based on his history of prior alcohol use.

I'm not sure if that's gonna make you eligible for the residential drug abuse treatment program, given the firearms that were involved in this case. BOP policy is not quite clear to me on that. But if you do do the RDAP, it's good for you, and it will help shorten your sentence.

The Court also announces that if it has miscalculated the advisory guideline range in any way, or erroneously departed or failed to depart in any way, that the Court would impose the same sentence as an alternative variant sentence in light of all the section 3553(a) factors that I have discussed. This is the sentence sufficient but not greater than necessary in

this case.

Anything further from the defendant?

MR. TARLTON: Nothing further at this time, Your Honor.

THE COURT: Mr. Diaz.

MR. DIAZ: No, Your Honor. Thank you.

THE COURT: Mr. Duncan, I wish you the best of luck.

Thank you for coming to support your loved one. Please make sure that he has the support he needs to come out the far end of this as a successful young man.

The defendant's remanded to the custody of the United States Marshal. We'll be in recess until 2:00 p.m.

(Proceedings concluded at 11:26 a.m.)

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/Risa A. Kramer                                    4/15/2025

Risa A. Kramer, RMR, CRR                          Date